*Shae-Von Edwards v. State of Maryland*, No. 0799 of the September 2023 Term, Opinion by Moylan, J.

**HEADNOTE:**

"A STRANGER KNOCKS" – THE UNDERLYING NARRATIVE: "A STRANGER KNOCKS" – I. CONTENTION ONE: REWARDS AND PERILS OF TESTIFYING IN ONE'S OWN DEFENSE – A. FEDERAL CIRCUIT COURTS OF APPEAL – B. THE STATE COURTS – C. THE ACADEMIC COMMUNITY – D. THE MARYLAND LAW – A CONTENTION THAT DOES NOT CONTEND – II. CONTENTION TWO: ENTITLEMENT TO A JURY INSTRUCTION – A STEEP HILL TO CLIMB – EXTREME JUSTIFICATION FOR AN EXTREME DEFENSE – SELF-DEFENSE, DEFENSE OF OTHERS, AND MISTAKE OF FACT – A. SELF-DEFENSE – 1. IMMINENT OR IMMEDIATE DANGER OF DEATH – 2. ACTUAL BELIEF ON THE PART OF THE APPELLANT – 3. ASSUMING A THREAT TO LIFE OR LIMB – "A GOOD SAMARITAN KNOCKS" – 4. IDENTIFYING THE COMBATANTS: WHO PICKED THE FIGHT? – 5. THE APPELLANT PICKED THE FIGHT – 6. WAS THE FORCE USED MORE THAN THE EXIGENCY DEMANDED? – 7. THE DUTY TO RETREAT – 8. "GETTING OUT OF DODGE": IT'S AN OBLIGATION, NOT AN OPTION – 9. "BANDITS COMING IN OVER TOWER BRIDGE!" – "I SHALL NOT WANT" "PERHAPS, THOU SHALT" – A MULTI-FACTORED ENTIRETY – B. THE DEFENSE OF OTHERS – "WAITING FOR GODOT": THE "OTHER" WHO NEVER WAS – 1. A REASONABLE BELIEF IN AN IMMINENT OR IMMEDIATE THREAT – 2. AN ACTUAL BELIEF,

**EVEN IF UNREASONABLE – 3. THE FOOTPRINTS OF AN AGGRESSOR – 4. WHAT IS A REASONABLE RESPONSE? – 5. MORE FORCE THAN WAS NECESSARY: AN IMMODERATE AND EXCESSIVE RESPONSE – C. MISTAKE OF FACT – 1. WHOSE MISTAKE OF FACT HAS BEEN GENERATED AS AN ISSUE? – AN ALTERNATIVE OR ECHO SCENARIO – "WHO'S THAT KNOCKING AT MY DOOR?" – III. CONTENTION THREE: CONSTITUTIONAL SPEEDY TRIAL – THE RIGHT TO A SPEEDY TRIAL: A SOFTER SCIENCE – COMPUTING THE LENGTH OF DELAY IN LIGHT OF SUPERSEDING SUSPENSIONS – THE LANGUAGE OF SUBTRACTION – THE LENGTH OF DELAY: ITS QUALITATIVE SIGNIFICANCE – THE LENGTH OF DELAY: ITS QUANTITATIVE SIGNIFICANCE – THE SERIOUSNESS OF THE CASE AT TRIAL – THE REASON FOR THE DELAY – DEMAND-WAIVER: A NECESSARY PART OF THE DRILL – OUT OF ONE CONTEXT AND INTO ANOTHER IS IT "RAINY" ENOUGH TO EVACUATE NEW ORLEANS? – THE ABSENCE OF PREJUDICE – THE <u>BARKER V. WINGO</u> BALANCING – THE RELATIVE LACK OF PREJUDICE AS A COUNTERWEIGHT TO REVERSIBLE ERROR**

Circuit Court for Baltimore City
Case No. 120188001

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 0799

September Term, 2023

_____

SHAE-VON EDWARDS

v.

STATE OF MARYLAND

_____

Zic,
Tang,
Moylan, Charles E., Jr.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.
Zic, J., joins in the judgment only.

_____

Filed: October 31, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

## "A Stranger Knocks"

When "A Stranger Knocks," is that good cause to shoot the stranger? The answer is a resounding, "No!"

This appeal is otherwise a smorgasbord of only marginal but nonetheless very interesting contentions. The appellant, Shae-von Edwards, was convicted in the Circuit Court for Baltimore City by a jury, presided over by Judge Lynn Stewart Mays, of the second-degree murder of Roderick Daniels, the attempted second-degree murder of Abdoul Ouedraogo, and related charges. On this appeal he raises three contentions, the order of which we have rearranged for analytic convenience. He contends:

1. **that the court erroneously permitted defense counsel to give the appellant an incorrect advisement about his right to testify;**

2. **that the court erroneously refused to instruct the jury about the defenses of 1) self-defense, 2) the defense of others, and 3) the mistake of fact; and**

3. **that he was denied his constitutional right to a speedy trial.**

## The Underlying Narrative:
## "A Stranger Knocks"

The key witness in this case, indeed the only witness to the crime itself, was Abdoul Ouedraogo, the victim of the attempted second-degree murder.

At shortly after 10:00 P.M. on June 2, 2020, Ouedraogo was returning from his job as a tow truck operator to his home at 5608 Haddon Avenue in Baltimore City. 5608 Haddon Avenue is a residential apartment building consisting of four units. Ouedraogo's residence is Unit D. On that night, he parked his tow truck on the street and then walked towards the apartment building. Just outside the building, Ouedraogo saw his neighbor,

Roderick Daniels, who resided in Unit B of the same building. The two men stayed outside and chatted, for perhaps as long as half an hour.

As they were chatting, Daniels noticed that their neighbor, who lived in Unit C, had apparently inadvertently left her keys in the outside of her front door. As a Good Samaritan, Daniels knocked on the door to alert the owner about her mislaid keys. Through the window of Unit C, Ouedraogo could see the silhouette of a person, but no one came to the door or otherwise responded to the knocking. Daniels continued to knock on the door as many as five or six times.

As Ouedraogo was then telling Daniels that he was calling it a night and heading inside to his own apartment, he saw an unfamiliar man approaching the building. Ouedraogo heard the man rudely accost Daniels with, "Why are you knocking on my girl's door?," and, "That's my daughter's mother." Ouedraogo testified that the man and Daniels began yelling angrily at each other. He then heard Daniels say, "Put your gun down." As Ouedraogo turned to look, he heard gunshots. He remembered hearing two shots and the next thing he remembered was waking up in the hospital. He himself had been shot five times. In court, Ouedraogo identified the appellant as the shooter.

That knocking on the door of Unit C by Roderick Daniels is argued by the appellant to have been the trigger for the entire criminal incident now before us. Alfred Hitchcock might well have entitled this factual scenario, or even the Opinion itself as "A Stranger Knocks." In any event, the "stranger" now lay dead.

Amber Dortch was a neighbor who lived at 5606 Haddon Avenue. On the night of June 2, 2020 she was returning home with her sister and her mother from a visit to her

2

cousin's home when she heard gunshots. As her mother was parking the car on Haddon Avenue, Ms. Dortch heard the shooting. Shortly thereafter, she saw a man with a gun run to a white Acura, parked immediately behind where Ms. Dortch and her family had just parked. He got in the Acura and drove off. In court, Amber Dortch identified the appellant as that man with a gun. Calling 911, Ms. Dortch gave the police the license plate number of the white Acura. Ms. Dortch then went up to where Ouedraogo was lying wounded and then to where Daniels was lying, apparently dead.

Detective Steven Fraser of the Baltimore Police Department Homicide Unit was the primary detective on the case. He responded to the crime scene at approximately 11:30 P.M. and spoke with witnesses including Cache Irvin, the woman who lived in Unit C. He had to knock "persistently" on Ms. Irvin's door, however, before she answered, which was not for "at least 30 minutes or so." Detective Fraser subpoenaed the cell phone records for a phone number to which Cache Irvin is the subscriber.

Jerome Taylor, a crime scene technician, testified that three metal tools – a socket, a socket wrench, and a socket wrench extension – were recovered from the grassy area where Daniels's body had been lying.

Dr. Donna Vincenti, an assistant medical examiner, performed the autopsy on Daniels's body. There were seven gunshot wounds to his body and they were the cause of what was determined to have been a homicide.

In following up on the license plate number of the white Acura, in which the appellant left the scene, Detective Fraser found that the car was registered to one Shavonn Jordan, who is the mother of the appellant. Detective Fraser discovered that cell phone

3

records revealed that on the night of the shooting, there had been a series of calls between the number listed to Cache Irvin of Unit C and the number listed to the appellant's mother.

## I. Contention One:
## Rewards And Perils Of
## Testifying In One's Own Defense

As a criminal defendant elects whether to take the stand and to testify in his own defense, he faces the difficult choice of which of two vitally important but sometimes contradictory rights to assert and which, by non-assertion, to waive. It is a close choice that should be carefully calibrated. As Judge Wilner explained for this Court in <u>Hamilton v. State</u>, 79 Md. App. 140, 142-43, 555 A.2d 1089, <u>cert. denied</u>, 316 Md. 550, 560 A.2d 1118 (1989):

> <u>[These] two rights, each of Constitutional dimension, are necessarily in conflict</u>. <u>A defendant must choose between them</u>. If he elects to testify, and thus subject himself to the possibility of self-incrimination through cross-examination, he gives up – waives – his equal but opposite right to refrain from compelled self-incrimination; if, on the other hand, to avoid that prospect, he elects not to testify, he obviously gives up – waives – his right to tell from his own lips his side of the story.
>
> <u>Precisely because the election of one of these Constitutional rights acts as a waiver of the other, the decision to choose between them is a critical one for the defendant and must therefore reflect</u>, at a minimum, <u>an awareness of these correlative rights and a basic understanding of what each entails</u>.

(Emphasis supplied).

In <u>Tilghman v. State</u>, 117 Md. App. 542, 553-54, 701 A.2d 847 (1997), this Court reaffirmed the gravity of that decision:

> The right to testify is a necessary corollary to the Fifth Amendment's guarantee against compelled testimony. These constitutional rights are inextricably intertwined, as <u>a criminal defendant's decision whether to testify necessarily involves invoking one constitutional right and waiving the other</u>.

4

Thus, in virtually every criminal trial, <u>there comes a time when the defendant must choose between two reasonable alternatives</u>, each of which requires him to waive a fundamental constitutional right.

(Emphasis supplied) (Internal citation omitted).

Because of the gravity of that decision, the <u>Tilghman</u> opinion places great emphasis on the importance of making certain that the defendant be fully informed of the circumstances bearing on that decision:

> The Fifth, Sixth, and Fourteenth Amendments to the United States Constitution guarantee the accused in a criminal case the right to testify on his own behalf. <u>As the right to testify is personal to the defendant, it may only be waived by him, and not by his counsel for him</u>. Moreover, because the right to testify is essential to due process of law in a fair adversary process, it <u>may only be waived knowingly and intelligently</u>, under the waiver standards established for fundamental constitutional rights in <u>Johnson v. Zerbst</u>, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). For the waiver of a fundamental right to be made knowingly and intelligently, <u>the accused must have a sufficient awareness of the relevant circumstances and likely consequences that forfeiting his right entails</u>.

<u>Tilghman</u>, 117 Md. App. at 553 (emphasis supplied) (internal citations omitted).

As his first contention, the appellant claims that he was erroneously denied full and accurate advice as to that important decision that he was being called upon to make. After the State had rested its case and his motion for a judgment of acquittal had been denied, defense counsel, at Judge Mays's invitation, advised the appellant with respect to both his right to testify and his converse right not to testify. At the conclusion of that advice, defense counsel asked the court if that advice had been adequate:

> DEFENSE COUNSEL:     Your Honor, subject to any other questions, I'll ask Mr. Edwards whether he has made his decision ultimately <u>but I wanted to make sure that the court</u> –
>
> THE COURT:     <u>The court is satisfied</u>.

DEFENSE COUNSEL:   Deemed it appropriate coverage of the issue.

THE COURT:   It is.

(Emphasis supplied).

The appellant subsequently elected not to testify. The appellant now contends that counsel actually gave the appellant incorrect advice and that the court erroneously failed to intervene to correct the false impressions that counsel had created. The appellant narrows his challenge to the following portion of counsel's advice to the appellant:

> DEFENSE COUNSEL:   I've seen this and it's legal, I've seen it happen, the Judge can allow the jurors to submit questions and say Judge, could you please ask Mr. Edwards this question. We want this question answered. And if the Judge deems that to be an appropriate question, the Judge could ask that question of you on cross examination essentially at the request of the jury even though the State didn't ask that question, even though the Judge didn't ask that question, even though that might not be a question or an area of questioning that I asked about on direct testimony. The Judge can under certain circumstances allow the jurors to submit questions and ask them of you if the Judge deems them to be appropriate questions. Do you understand that?

(Emphasis supplied).

The appellant now contends that he waived his constitutional right to testify in his own defense based on that incorrect advice given him by counsel. The sum total of the appellant's legal argument about this issue is the following passage from his appellate brief:

> Where defense counsel gave Appellant incorrect advice about what could occur during cross examination if he elected to take the stand and testify in his defense, the trial court erred by failing to intervene. Where the court let Appellant base his decision on whether to testify on defense counsel's incorrect advice, Appellant's waiver of the right to testify may not be deemed knowing and voluntary.

(Emphasis supplied).

6

In no respect, however, does the appellant so much as suggest in what respect counsel's advice to the appellant was in any way in error. He never explains how or why the advice was "incorrect." He never argued as to how it was "incorrect." He simply asserts, by way of *ipse dixit*, that it was "incorrect."

It was, however, completely in accord with the clear holding of this Court in Handy v. State, 201 Md. App. 521, 550-51, 30 A.3d 197 (2011), where this issue was squarely before the Court. After pointing out that the trial judge enjoys the unquestioned prerogative of asking questions of the appellant from the bench, Judge Sharer posed the next extension of that prerogative:

> Notwithstanding this established principle, it appears that the issue whether jurors may also question witnesses, or rather, as in this case, whether a trial court may ask a witness a question proposed by the jury, is an issue of first impression in Maryland. Nonetheless, as we shall discuss, it is a practice that is developing in both federal and state court jurisprudence. Hence, we believe the subject to be worthy of discussion.

(Emphasis supplied).[1]

## A. Federal Circuit Courts of Appeal

Handy's survey of the state and federal caselaw looked first, 201 Md. App. at 551, to the federal courts of appeal:

> The majority of federal courts to address the issue have held that whether to permit juror questioning is a matter of trial court discretion.

---

[1]     It is an eerily strange contention. It is virtually impossible to conceive of an intrepid defendant who would boldly assert his right to testify notwithstanding the threat of searing cross-examination at the hands of a skilled prosecutor and even further examination by a relentless trial judge but who would timidly back away from testifying by the fear that a juror might be able to propound a question. How might one explain such a bizarre tipping point? Even if counsel's advice had been technically incorrect (it was not), so what?

(Emphasis supplied). It cited <u>United States v. Bush</u>, 47 F.3d 511, 514 (2d Cir.1995); <u>United States v. Hernandez</u>, 176 F.3d 719, 723 (3d Cir.1999) (approving juror questioning of witnesses "so long as it is done in a manner that insures the fairness of the proceedings, the primacy of the court's stewardship, and the rights of the accused."); <u>United States v. Collins</u>, 226 F.3d 457, 465 (6th Cir.2000); <u>United States v. Groene</u>, 998 F.2d 604, 606 (8th Cir.1993); <u>United States v. Richardson</u>, 233 F.3d 1285, 1290 (11th Cir.2000); <u>United States v. Rawlings</u>, 522 F.3d 403, 407 (D.C. Cir.2008) ("[A]t least ten courts had considered the issue and concluded that juror questions are within the trial judge's discretion.").

## B. The State Courts

This Court's survey in <u>Handy</u> turned to the broad consensus of seventeen state courts:

> <u>The majority of state courts that have considered the question have also held that the practice is left to the sound discretion of the trial court.</u>

(Emphasis supplied) 201 Md. App. at 551, citing cases from Alabama, Alaska, Arizona, the District of Columbia, Hawaii, Kansas, Indiana, Massachusetts, Montana, Nevada, New Jersey, New Mexico, Ohio, South Carolina, Vermont, Virginia, and Wyoming.

## C. The Academic Community

The broad consensus of the academic community also supports the prerogative of a juror, through the discretion of the trial judge, to ask questions of a testifying defendant. *See* Valen, <u>Jurors Asking Questions: Revolutionary or Evolutionary?</u>, 20 N. Ky. L. Rev. 423 (1993); Frankel, <u>Legal Institutions: A Trial Judge's Perspective On Providing Tools For Rational Jury Decision-making</u>, 85 Nw. U. L. Rev. 221 (1990); L. Sand and S. Reiss,

A Report on Seven Experiments Conducted by District Court Judges in the Second Circuit, 60 N.Y.U. L. Rev. 423, 444 (1985); L. Heuer and S. Penrod, Increasing Juror Participation in Trials Through Note Taking and Question Asking, 79 Judicature 256, 259-62 (1996); Purver, Propriety of Jurors Asking Questions in Open Court During Course of Trial, 31 A.L.R. 3d 872 (1970).

**D. The Maryland Law**

Reinforced by its survey of the state and federal caselaw and by the broad consensus of the academic community, this Court in Handy v. State, 201 Md. App. at 556, did not hesitate to conclude:

> With these principles in mind, we conclude that appellant was not prejudiced when the court asked Couvillion the two questions proposed by the jury.

(Emphasis supplied).

> Our ultimate decision was clear:

> In sum, we find no prohibition of a process by which jurors may post questions to witnesses, albeit under carefully developed, explained, and monitored procedures consistent with Md. Rule 4-326. Ultimately, such a process is within the sound discretion of the trial court, a discretion that is to be carefully exercised.

Id. at 557. (Emphasis supplied).

## A Contention That Does Not Contend

In view of the clear decision by this Court in Handy v. State that if a juror wishes to ask a question of a testifying defendant and communicates that desire to the trial judge, a trial judge in Maryland has it within his or her discretion to ask such a question of the

9

defendant, we are at a loss to discern what the appellant is challenging. It seems to us to be a contention that is not contending anything.

The appellant boldly asserts that defense counsel's advice to the appellant about the perils of testifying was erroneous. At no point, however, does the appellant even attempt to explain or to argue precisely how that advice was erroneous. A juror may, indeed, have a question and may request that the judge ask the question. The trial court may, indeed, in its discretion, then ask that question.

The appellant does not, moreover, in any way argue, or even suggest, otherwise. The appellant cites no authority, state or federal, holding that such a question from a juror is not permitted. Nor does the appellant cite any academic authority to that end. The bottom line is that we cannot agree that the advice about such possible questioning was in any way erroneous. There is simply no substance to the contention. The only thing the contention does is to set the tone for the next contention, which is equally lacking in ultimate substance.

## II. Contention Two: Entitlement To A Jury Instruction

The appellant's tripartite second contention is that Judge Mays erroneously refused to give three requested jury instructions on the subjects of 1) self-defense, Maryland Pattern Jury Instructions–Criminal 5:07; 2) the defense of others, MPJI-Cr 5:01; and 3) mistake of fact, MPJI-Cr 5:06.

The appellant is only entitled to have the jury instructed on those respective issues, however, if those issues have been generated as legitimate jury issues by the evidence in

10

the case. As Judge Raker stated for the Supreme Court of Maryland in <u>General v. State</u>, 367 Md. 475, 486, 789 A.2d 102 (2002), *quoting* Chief Justice Rehnquist for the Supreme Court of the United States in <u>Mathews v. United States</u>, 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988):

> As a general proposition <u>a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor</u>.

(Emphasis supplied).

> As Judge Raker further explained, <u>Id.</u> at 486-87:

> <u>Whether a particular instruction must be given depends upon whether there is any evidence in the case that supports the instruction; if the requested instruction has not been generated by the evidence, the trial court is not required to give it</u>. Whether the evidence is sufficient to generate the requested instruction in the first instance is a question of law for the judge.

(Emphasis supplied) (Internal citations omitted).

In <u>Lewis v. State</u>, 263 Md. App. 631, 646, 326 A.3d 11 (2024), Judge Deborah Eyler recently wrote for this Court:

> In Maryland, a "court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding." Md. Rule 4-325(c). A trial court's decision to give a jury instruction or not to give a jury instruction is reviewed for abuse of discretion. <u>Carroll v. State</u>, 428 Md. 679, 689 (2012); <u>Thompson v. State</u>, 393 Md. 291, 311 (2006). <u>A trial court must give a requested instruction if it is a correct statement of the law, is generated by the evidence, and is not fairly covered by other jury instructions given by the court</u>. <u>Thomas</u>, 393 Md. at 302 (citing Md. Rule 4-325(c) and <u>Ware v. State</u>, 348 Md. 19, 58 (1997)).

(Emphasis supplied).

For present purposes, the critical criterion is that in order for a jury instruction to be mandatory, the issue which is the subject of the requested instruction must have been

11

"generated by the evidence." *See also* Rainey v. State, 480 Md. 230, 255, 280 A.3d 697 (2022) ("Did the defendant produce that "minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired?"); McMillan v. State, 428 Md. 333, 355, 51 A.3d 623 (2012) ("There must be some evidence to support each element of the defense."); Bazzle v. State, 426 Md. 541, 550, 45 A.3d 166 (2012) ("A requested jury instruction is applicable if the evidence is sufficient to permit a jury to find its factual predicate."); Roach v. State, 358 Md. 418, 428-29, 749 A.2d 787 (2000); Dishman v. State, 352 Md. 279, 292, 721 A.2d 699 (1998) ("The determination of whether an instruction must be given turns on whether there is any evidence in the case that supports the instruction."); State v. Martin, 329 Md. 351, 357 619 A.2d 992 (1993) ("[T]o merit an instruction, the issue as to which the request is made must have been generated by the evidence."); Rubin v. State, 325 Md. 552, 585, 602 A.2d 677 (1992) ("A court, when properly requested to do so, is obliged to instruct on the legal issues generated by the evidence."); Robertson v. State, 112 Md. App. 366, 375, 685 A.2d 805 (1996) ("[A] defendant is generally entitled to present his theory of the case through a suggested instruction when there is evidence before the jury that supports it.").

Nowhere in his appellate brief, incidentally, does the appellant indicate whether those three requested jury instructions were intended to apply exclusively to the appellant's conviction for the second-degree murder of Roderick Daniels or were also intended to apply to his conviction for the attempted second-degree murder of Ouedraogo. Is this appellant actually claiming that he shot Ouedraogo five times in self-defense? The

12

circumstances in the two cases diverge significantly. The distinct defenses do not simply ebb and flow back and forth between the murder and the attempted murder. They are absolutely distinct. From the utter lack of so much as a passing mention of this difference, however, we will focus primarily on the case against the appellant for the actual murder of Daniels and not at the case against him for the attempted murder of Ouedraogo. As a practical matter, it will not make any difference, however. If the appellant failed to generate genuine factfinding issues in the murder case of Roderick Daniels, he *ipso facto* would have failed to generate genuine factfinding issues with respect to the more attenuated application of those defenses in the attempted murder case involving Abdoul Ouedraogo.

### A Steep Hill To Climb

A jury instruction on a subject is not required, of course, unless a genuine jury issue dealing with the subject of the instruction has been generated by the evidence. That requirement poses an intriguing challenge for the appellant. Although jury issues must be generated to justify instructions, the appellant himself generated absolutely nothing. The appellant did not testify. The appellant did not call a single witness to testify. The appellant did not introduce any physical evidence or any documentation. The defense simply did not put on a case. He generated nothing.

He has nonetheless assumed the daunting challenge of persuading us that, although jury issues must be generated, he himself need not do the generating. He claims that jury issues had already been adequately generated for him by the State's case. Theoretically, of course, that is possible, Lee v. State, 193 Md. App. 45, 55, 996 A.2d 425 (2010); Howell v. State, 56 Md. App. 675, 683-84, 468 A.2d 688 (1983), but it is a steep hill to climb.

What does the appellant actually tell us in that regard? That is what matters. Self-defense does not speak for itself. Nor does the defense of others.

## Extreme Justification For An Extreme Defense

Both the defenses of self-defense and the defense of others are not minor or passing aspects of criminal procedure. They are what would be rare and extreme permitted breaches of the criminal law at its most serious. Under certain tightly controlled and rigidly monitored circumstances, a defendant may be justified in committing what would otherwise be a violent criminal assault, possibly resulting in death itself. Such an extreme departure from the law's prohibition is only permitted, however, for literally life-threatening necessity.

The threat to be warded off by either of these extreme defenses is no mere threat of bodily harm. It is only the literal threat of death or of <u>serious</u> bodily injury that will suffice. Lesser threats may justify lesser countermeasures, but not violent and potentially deadly use of force. For lesser threats, lesser countermeasures may be undertaken to forfend the potential risk of harm. For these more extreme defenses of self-defense and the defense of others, however, the threat of death or serious bodily harm must be literally imminent and immediate. The threatened danger must be <u>in esse</u> and not merely <u>in potentia</u>. The threat must exist now. Defendants have a tendency to water down the requirements for these extreme defenses but the extreme necessity justifying those extreme defenses must not be watered down, as if the permitted exemption were only to ward off some minor risk. These more extreme exemptions from the law's normal prohibitions demand extreme and urgent justifications. The threat posed, moreover, must be imminent and immediate.

## Self-Defense, Defense Of Others, And Mistake Of Fact

The first of the three jury instructions that the appellant claims he was entitled to deals with self-defense.

### A. Self-Defense

The jury instruction in question, MPJI-Cr 5:07 is as follows:

You have heard evidence that the defendant acted in self-defense. Self-defense is a complete defense and you are required to find the defendant not guilty if all of the following four factors are present:

> (1) the defendant was not the aggressor [[or, although the defendant was the initial aggressor, [he] [she] did not raise the fight to the deadly force level]];
>
> (2) the defendant actually believed that [he] [she] was in immediate or imminent danger of bodily harm;
>
> (3) the defendant's belief was reasonable; and
>
> (4) the defendant used no more force than was reasonably necessary to defend [himself] [herself] in light of the threatened or actual harm.

[Deadly force is that amount of force reasonably calculated to cause death or serious bodily harm. If you find that the defendant used deadly-force, you must decide whether the use of deadly-force was reasonable. Deadly force is reasonable if the defendant actually had a reasonable belief that the aggressor's force posed an immediate or imminent threat of death or serious bodily harm.]

[[In addition, before using deadly-force, the defendant is required to make a reasonable effort to retreat. The defendant does not have to retreat if [the defendant was in [his] [her] home], [retreat was unsafe], [the avenue of retreat was unknown to the defendant], [the defendant was being robbed], [the defendant was lawfully arresting the victim]]. [If you find that the defendant did not use deadly-force, then the defendant had no duty to retreat.] In order to convict the defendant, the State must prove that self-defense does not apply in this case. This means that you are required to find the defendant not guilty, unless the State has persuaded you, beyond a reasonable doubt, that at least one of the four factors of complete self-defense was absent.

15

As we probe to discover whether there was a justiciable issue as to self-defense, we begin by looking at the classic definition of perfect self-defense articulated by Judge Orth in <u>Dykes v. State</u>, 319 Md. 206, 211, 571 A.2d 1251 (1990):

> (1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;
>
> (2) The accused must have in fact believed himself in this danger;
>
> (3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and
>
> (4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*See also* <u>State v. Faulkner</u>, 301 Md. 482, 485, 483 A.2d 759 (1984); <u>Tichnell v. State</u>, 287 Md. 695, 718, 415 A.2d 830 (1980); <u>DeVaughn v. State</u>, 232 Md. 447, 453, 194 A.2d 109 (1963); <u>Bruce v. State</u>, 218 Md. 87, 96-97, 145 A.2d 428 (1958); <u>Guerriero v. State</u>, 213 Md. 545, 549, 132 A.2d 466 (1957).

As we look at the multi-factored self-defense paradigm, it is clear that the burden of generating a *prima facie* jury issue is cast on the defendant. As Chief Judge Robert C. Murphy explained for the Maryland Supreme Court in <u>State v. Evans</u>, 278 Md. 197, 208, 362 A.2d 629 (1976):

> <u>The burden of initially producing "some evidence" on the issue of</u> mitigation or <u>self-defense</u> (or of relying upon evidence produced by the State) sufficient to give rise to a jury issue with respect to those defenses <u>is properly cast upon the defendant</u>.

(Emphasis supplied). That is the burden to produce a *prima facie* case as to each and every factor of this multi-factored self-defense paradigm.

16

## 1. Imminent Or Immediate Danger Of Death

In terms of whether the appellant had reasonable grounds to believe himself to be in imminent or immediate fear of death or serious bodily harm from Roderick Daniels so that it was necessary for him to kill Daniels to save himself, we cannot find that the appellant ever generated a genuine jury issue in that regard. The appellant, who would normally have to be the prime source of information for such a subjective belief on his part, never took the stand. The appellant, moreover, called no defense witnesses and put on no defense of any sort. The only witness to events prior to the shooting was Ouedraogo. His testimony did not suggest in any way that the appellant was ever in imminent or immediate danger of death or serious bodily harm at the hands of Roderick Daniels. There was simply no evidence in the case to suggest the existence of such an issue. What did Roderick Daniels ever do or say that placed the appellant in immediate fear for his life?

## 2. Actual Belief On The Part Of The Appellant

A key factor in the multi-factored self-defense paradigm is whether the appellant actually believed himself to be in imminent or immediate danger of death or serious bodily harm, even if subjectively such were not the actual reality. This, of course, is the element that might reduce a case of perfect self-defense to a case of imperfect self-defense. Once again, who could tell us what was in the appellant's mind better than the appellant himself. He, of course, did not do so and neither did any defense witness on his behalf. In terms of witnesses for the State, Ouedraogo certainly did not do so. The only thing Ouedraogo ever heard Daniels say to the appellant was "Put the gun down." That was not in and of itself a reason for the appellant to fear for his life. As to what was actually in the appellant's state

17

of mind, no genuine jury issue was ever generated. *See* <u>State v. Martin</u>, 329 Md. 351, 363, 619 A.2d 992 (1993) ("The question of one's state of mind, or his intention, at a particular time is one of fact, and is subjective in nature. Therefore it must be determined by a consideration of his acts, conduct and words.") (Internal citations omitted.).

### 3. Assuming A Threat To Life Or Limb

Pursuant to the law of self-defense, the appellant should have told us precisely what it was that Roderick Daniels had done or precisely what it was that Roderick Daniels had said that made Roderick Daniels appear to have been more menacing to the appellant than the Avon Lady would have appeared to be under exactly the same circumstances. Or would they have appeared to have been equally menacing? What was the actual evidence? Not speculation! Evidence? Roderick Daniels was, after all, Cache Irvin's immediate neighbor in the same small apartment complex. So, indeed, was Abdoul Ouedraogo. She was nestled between them. They were not strangers to her. Their very presence should have been reassuring to her, not threatening. Ouedraogo was trying to leave the scene. He was entering his own apartment. The appellant, however, is asking us simply to assume, without evidence, some menacing activity on their part. Judge Mays did not assume such. Nor shall we.

### "A Good Samaritan Knocks"

Perhaps our drama should be recast as "A Good Samaritan Knocks." For his humanitarian impulse and for nothing else, the Good Samaritan here was shot and killed. The heart of this legal case is the appellant's effort to blame the Good Samaritan as being ultimately responsible for his own death. No good deed goes unpunished.

18

## 4. Identifying The Combatants:
## Who Picked The Fight?

In the case now before us, the appellant was clearly the aggressor. As such, of course, the appellant forfeited any entitlement to a jury instruction either on the subject of self-defense or on the subject of defense of others. Neither Roderick Daniels nor Abdoul Ouedraogo ever behaved aggressively. The appellant was not responding in self-defense. He had been the initial aggressor. Roderick Daniels did not pick a fight with the appellant. The appellant picked a fight with Roderick Daniels. There was absolutely no evidence of Roderick Daniels doing anything to bring on the clash between the two (or three) men. A justiciable jury issue to the contrary was not generated.

## 5. The Appellant Picked The Fight

Even if the first two factors in the multi-factored paradigm of self-defense were otherwise, however, there would still not be a genuine jury issue as to self-defense if the appellant had been the aggressor in what became the deadly confrontation. His status as the aggressor would obviate or disqualify the very existence of the defense of self-defense. *See* Cunningham v. State, 58 Md. App. 249, 252-58, 473 A.2d 40 (1984).

In this case, the appellant was indisputably the aggressor and there was not a shred of evidence to suggest or raise an issue otherwise. As Roderick Daniels and Abdoul Ouedraogo were finishing their conversation and Ouedraogo was adjourning to his own unit, the appellant parked his car and aggressively approached the two men. They were not advancing toward him. He was advancing toward them. The appellant, moreover, was armed with his gun in his hand. Neither victim was armed. The appellant angrily accosted

Daniels with shouts of, "Why are you knocking on my girl's door?" and, "That's my daughter's mother." Ouedraogo, who had left the immediate scene, heard the appellant and Daniels yelling angrily at each other. The only thing he heard Daniels say was, "Put your gun down." With that, the appellant began firing. In rapid fire succession, the appellant fired twelve bullets into the bodies of the two men.

Even at the point when the appellant and Daniels had been yelling at each other, it was unquestionably the appellant who escalated a non-deadly conflict into a deadly one. A shouting match at worst had degenerated into a one-sided shoot-out. With respect to the five bullets that the appellant fired into the body of Ouedraogo, one cannot seriously question who was the aggressor.

Not a shred of evidence in the case reasonably generated any genuine jury issue that the appellant was anything other than the aggressor with respect to Ouedraogo. What precisely did Ouedraogo himself actually do to place the appellant in imminent and immediate fear of death or serious injury at the hands of Ouedraogo specifically? What precise evidence suggested that Ouedraogo himself was in possession of a gun or other deadly weapon? What precise evidence generated a genuine jury issue that the appellant was entitled to fire on Ouedraogo in legitimate self-defense? What did Ouedraogo ever say to anyone or what did Ouedraogo ever do except move toward his own apartment? What was the precise basis for the requested jury instructions? The appellant did not tell us any of this.

A defendant may not court a controversy but then invoke the right to use deadly force to ward off any peril, real or imagined, inherent in that controversy. This appellant

20

may not menacingly accost Roderick Daniels but then claim the right of self-defense against what he imagines might be a logically retaliatory response by Daniels to that accosting. This was not a shoot-out on Front Street in Dodge City, where survival may depend on who is faster on the draw. Nor, in the language of the common law, was it a mutual affray. There was nothing mutual about it. From start to finish, Daniels was on the receiving end and the appellant was the aggressor. It was the appellant who picked the fight.

There was not a shred of evidence that Daniels did anything either to ignite the controversy in the first instance or even to escalate it. "Put your gun down" did not escalate the level of the conflict. It was obviously intended to mollify it. Daniels' attempt to explain why he was knocking on the door of Unit C was also aimed at mollification, not escalation. Daniels was not in any way involved in an act of mutual combat.

### 6. Was The Force Used More Than The Exigency Demanded?

Whatever the level of angry shouting between the appellant and Roderick Daniels, that shouting had never progressed beyond the non-deadly level. The two men had not even exchanged physical blows. The last desperate shout from Daniels, moreover, revealed that the appellant was wielding a gun, "Put your gun down." With that, the appellant fired twelve unanswered bullets into the bodies of Daniels and Ouedraogo. Who does the appellant claim escalated a non-deadly confrontation into a deadly one? The appellant indisputably did not generate a jury issue that the seven bullets in the body of Daniels or the five bullets in the body of Ouedraogo were anything other than excessive overreactions.

21

Self-defense had not been generated as a genuine jury issue and no jury instruction was therefore required.

## 7. The Duty To Retreat

In the doctrine of self-defense, moreover, the core fourth component of the paradigm is that the defendant shall not have used more force than was necessary to protect himself from imminent death or grievous bodily harm. Such protection is the only animating purpose of the law of self-defense. This fourth component of that paradigm recognizes that there may be other ways of achieving that life-saving purpose short of killing the would-be killer. It absolutely requires that the defendant consider those other options and find them to be unavailable before resorting to the extreme option of killing in self-defense. One must flee before one may shoot. This is what is meant by the command that he exert no more force than is necessary. This does not mean simply two bullets instead of five. It is not simply a quantitative measure. It also means, qualitatively, avoiding bullets altogether if another and more peaceful option is available, such as retreat.

In the law of self-defense, the law admonishes, "Move away from the sound of the guns, unless it is unsafe to do so." To avail oneself of the law of self-defense, one must take every opportunity to avoid the deadly conflict. This is a key component of the self-defense paradigm that cannot be blithely ignored. As Judge Wilner explained for the Supreme Court of Maryland in Burch v. State, 346 Md. 253, 283, 696 A.2d 443 (1997):

> One of the elements of the defense of self-defense is the duty of the defendant to retreat or avoid danger if such means were within his power and consistent with his safety.

22

(Emphasis supplied.) Judge Wilner spoke not about an "option" to retreat but of the "duty" to retreat. *See also* DeVaughn v. State, 232 Md. 447, 194 A.2d 109 (1963); Bruce v. State, 218 Md. 87, 97, 145 A.2d 428 (1958); Corbin v. State, 94 Md. App. 21, 25, 614 A.2d 1329 (1992).

In this case specifically, a safe avenue of retreat for the appellant was readily available to the appellant if he believed himself to be in danger of death or serious bodily harm. It was the route described by the neighbor, Amber Dortch, who arrived home just as the shooting started. It was the escape route actually taken by the appellant. As a safe avenue of retreat, moreover, it was the alternative to danger that could and should have been taken by the appellant before the shooting. It clearly would have been enough to have removed himself from whatever danger to himself he perceived. He has generated no issue as to why he did not take it if self-defense had truly been his concern. The genuine jury issue would have been why he did not defend himself by choosing the alternative of retreating instead of shooting. The law of self-defense demands that you not kill in self-defense if an avenue of safe retreat is available.

His flightpath from the scene of his crime actually taken by the appellant immediately after shooting Roderick Daniels was indisputably open, in reverse, to the appellant as an avenue of retreat or danger-avoidance immediately before the shooting. The route of available retreat was free of any danger or other impediment. The appellant consciously opted not to take it but to shoot Daniels seven times instead. The appellant utterly failed to generate any genuine issue that this obviously available avenue of retreat was dangerous or otherwise unfeasible.

## 8. "Getting Out Of Dodge": It's An Obligation, Not An Option

If one can somehow manage to "get out of Dodge" without shooting one's way out, the law of self-defense insists that such a non-deadly alternative route out of town must always, when available, be taken. Shooting is not even a last resort. The unimpeded route "out of Dodge" that the appellant actually took immediately after the shooting was equally open to him, of course, as his way "out of Dodge" immediately before the shooting. The vistas for open and unimpeded retreat in this case were boundless. In no sense were they dangerous or untenable. The appellant, however, opted not to take such a retreat but to shoot Daniels seven times instead. How does he now justify such a choice within the "do not be excessive" restrictions of self-defense law? He does not even try. Accordingly, a jury instruction in this regard was not appropriate.

## 9. "Bandits Coming In Over Tower Bridge!"

Let us turn for a moment to World War II for a supportive analogy. An incoming bomber will never have a valid claim of self-defense against its welcoming anti-aircraft battery even as the battery fires off its narrowly targeted greeting at the bomber. The incoming bomber still enjoys an option, if not indeed an actual obligation, to veer off and to fly away. The anti-aircraft battery, by contrast, never enjoys such tactical maneuverability. The incoming bomber, moreover, can never shed its tainted character as the original aggressor. "Why are you even here?" has an indelible ring to it that can never be taken for granted. There is an actual duty to retreat. The burden, moreover, of proving compliance with that duty to retreat is on the appellant. With respect to his compliance

with that duty, the appellant inexplicably offered nothing. He is accordingly entitled to nothing.

In this case, the incoming bomber, as it menaced the East London Docks by flying in over Tower Bridge, was metaphorically most definitely the appellant. For the incoming bomber, of course, self-defense is never an option. It is the incoming bomber, after all, that approaches the anti-aircraft battery. The anti-aircraft battery never approaches the incoming bomber. That one-way nature of the approach sequence is indisputable. The bomber (metaphorically the appellant), moreover, still had one last chance to avoid ending up in that critical clash.

All the anti-aircraft battery can do is to respond to an aggressive scenario it cannot control. That was all, of course, that either Roderick Daniels or Abdoul Ouedraogo could do. They were clearly not the aggressor and could not relieve the appellant of that provocative role. It was the appellant who picked the fight, a fight he was obliged to avoid.

The duty to retreat imposed on this appellant the clear obligation to explain why, faced with the unimpeded chance to do so, he failed to veer off and head for the coast. German Bomber Command, of course, may have forbidden it. Anglo-American common law, on the other hand, required it. By which standard, pursuant to which command, shall we judge the appellant? We opt for the common law.

## "I Shall Not Want"
## "Perhaps, Thou Shalt"

The appellant, as we have noted, presented no defense. He nonetheless claims to have been blessed with bounteous jury issues and advisory instruction entitlements through

the efforts of others. Looking to evidence other than his own, he claims to have had "a table preparest before [him] in the presence of [his] enemies."[2] Without any effort on his part, he boasts that "his [legal] cup runneth over." "I don't need to prove anything. The State proved it for me."

On the actual evidence in the case, however, the Fates were not nearly so generous. For each of four separate and distinct reasons, the appellant's evidence in this case failed to generate a valid issue of self-defense. The auguries were simply not there. The appellant moreover does not even argue a case of self-defense generated by the State's evidence. Far from retreating, he instinctively moved to the sound of the guns. The appellant sought the combat. He nevertheless blithely assumes self-defense. The appellant, however, was not entitled to a jury instruction on self-defense. His evidentiary cup did not "runneth over." Is our generative criminal scenario, which we have titled "A Stranger Knocks," actually no more than a case of "A Next-Door Neighbor Raps On The Door"? Was the difference in perception actually deserving of twelve bullets?

## A Multi-Factored Entirety

The defense of self-defense is a multi-factored entirety. Except for the one sliding or shifting relationship between perfect self-defense and imperfect self-defense, dependent on the defendant's actual but unreasonable belief in the threat of harm, a fatal flaw in any of the factors is fatal to the survival of the entirety. There cannot be a genuine jury issue generated with respect to an isolated factor if, because of such a fatal flaw, there no longer

---

[2] Psalm XXIII.

remains a genuine jury issue generated with respect to self-defense as an entirety. The viability of the jury issue that must be generated depends upon the collective health of the totality. The defense of self-defense rises or falls as an entirety. The same necessity to look at the entirety applies our analysis of the defense of others and to the mistake of fact.

**B. The Defense Of Others**

The jury instruction in question, MPJI-Cr 5.01, Defense of Others, is as follows:

You have heard evidence that the defendant acted in defense of [name of person]. Defense of others is a defense, and you are required to find the defendant not guilty if all of the following four factors are present:

(1) the defendant actually believed that the person he was defending was in immediate or imminent danger of bodily harm;

(2) the defendant's belief was reasonable;

(3) the defendant used no more force than was reasonably necessary in light of the threatened or actual force; and

(4) the defendant's purpose in using force was to aid the person he was defending.

In order to convict the defendant, the State must prove that the defense of others does not apply in this case. This means that you are required to find the defendant not guilty unless the State has persuaded you, beyond a reasonable doubt, that at least one of the four factors of defense of others was absent.

The defense of others, like self-defense, is a multi-factored paradigm. Lee v. State, 193 Md. App. 45, 54-65, 996 A.2d 425 (2010); Dishman v. State, 118 Md. App. 360, 376-78, 702 A.2d 949 (1997); Alexander v. State, 52 Md. App. 171, 171-85, 447 A.2d 880 (1982). Except for the rare phenomenon of one factor's occasional one-level slippage from the perfect defense of others to the imperfect defense of others, the failure of the defendant

to generate an issue as to any single factor of the paradigm is tantamount to the failure to generate the issue of the paradigm as a whole. As <u>Lee v. State</u> explained, 193 Md. App. at 55, "[W]e turn to the evidence relied upon by the appellant at trial in support of his claim of defense of others to determine if he met his burden of producing 'some evidence.'"

With respect to what can at times be the subtle borderline between the perfect defense of others and the imperfect defense of others, Judge Deborah Eyler explained in <u>Lee v. State</u>, 193 Md. App. at 58-59:

> <u>Defense of others</u>, like self-defense, <u>is a justification or mitigation defense</u>. If the appellant proved that he was acting in perfect defense of others, *i.e.*, that he held <u>a subjectively reasonable belief that he had to use force to defend another against immediate and imminent risk of death or serious harm *and* the level of force he used was objectively reasonable to accomplish that purpose</u>, he would be entitled to an acquittal on the murder charge. *See* Judge Charles E. Moylan, Jr., *Criminal Homicide Law* 194 (2002). On the other hand, <u>if the appellant held an actual belief that he had to use force to defend another, but his belief was not objectively reasonable and/or the level of force he used was not objectively reasonable</u>, the result would be to mitigate what might otherwise be murder down to the manslaughter level. The former is the "perfect" or "complete" form of the defense; the latter is the "imperfect" or "partial" form.

(Emphasis supplied).

**"Waiting For Godot"[3]:**
**The "Other" Who Never Was**

For starters, the defense of others absolutely requires that there be at least one "other" who is to be defended. The first factor of that multi-factored paradigm is that the appellant actually believed that the person he was defending was in immediate or imminent danger of death or severe bodily harm. The appellant here, of course, never told the court

---

[3] In Samuel Beckett's "Waiting For Godot" Godot, of course, never arrived.

who it was that he was defending. He wants us to infer that it was Cache Irvin, the resident of Unit C. He wants us to infer this based on his shout of "Why are you knocking on my girl's door?" as testified to by Ouedraogo. Not only did the appellant never generate a jury issue in this regard but neither, of course, did Cache Irvin. She was never called to testify. She never testified that she was under any threat of attack. She could have done so, but she did not. The physical scene itself, moreover, did not do so.

It is awkward to commit a violent assault in ostensible defense of others on an empty stage. If the "other" is not present in esse, the threat to that "other" would appear to be far more of a potential threat or future risk rather than something "imminent and immediate," unless "imminent" and "immediate" are drained of their meaning. If the "other" is not present in esse, the potential risk would appear to be much more an abstract threat of indeterminate future harm rather than an actual threat of death or serious bodily harm "right here and right now." In terms of the "other's" jeopardy, the proximity to the danger makes the danger more real. In this case, however, there was no "other" on the scene. The defense of others may not be unduly attenuated. It must be imminent and immediate. Lee v. State, 193 Md. App. at 65 ("The defense of defense of others may not serve to justify or mitigate the use of deadly force when the person ostensibly being defended is not being attacked and is not even the target of a threatened attack." (Emphasis supplied)).

The defense of others defense generally anticipates that the "other" being defended and the defendant's ultimate victim, will almost certainly be, at that critical moment, engaged essentially in hand-to-hand combat, that the two will be exchanging blows, or wrestling on the ground. It will generally be a two-person conflict, mano-a-mano. The

defense of others defense does not contemplate that the "other person" being defended will not even be present at the scene. The evidentiary scenario in this case simply did not remotely generate such a genuine jury issue involving the defense of others. Judge Mays properly declined to give the jury instruction. The defense of others does not typically operate with the "other" in absentia. Godot needs to be on the scene.

## 1. A Reasonable Belief
## In An Imminent Or Immediate Threat

The defense of others, as we have noted, is like self-defense a multi-factored paradigm. The first of those factors is that the appellant reasonably believed that the "other" he intervened to defend was under the imminent and immediate threat of death or serious bodily harm. The appellant, of course, never testified as to what, if anything, he actually believed. He simply wants us to infer that.

Even accepting, arguendo, that the "other" whom the appellant sought to defend was Cache Irvin, we cannot agree that a genuine jury issue had been generated that Cache Irvin was under an imminent and immediate threat of death or serious bodily harm. She was inside her apartment with its outside door actually closed. A knock on the door or a ringing of the doorbell, even late at night, might generate some apprehension. It does not, however, generate an imminent and immediate threat of death or serious bodily harm. There are levels of apprehension. This is particularly so when the knock on the door is not followed by some attempt to break into the apartment but by yet another knock on the door after some brief passage of time followed by yet another.

A knock on the door, moreover, could be for any number of reasons, most of them clearly non-deadly, from neighborly complaints to political solicitations to the Avon Lady. A knocking at the door need not be necessarily by the grim reaper. Shortly after the shooting, Detective Steve Fraser knocked on Cache Irvin's door frequently and "persistently." That knocking at the door by Detective Fraser, however, did not generate an issue as to an imminent and immediate threat of harm to Cache Irvin. No genuine jury issue was generated that Cache Irvin was under an imminent or immediate threat of death or serious bodily harm. Is there something in the quality of the knocking?[4] No jury instruction as to an imminent or immediate threat to Cache Irvin was called for.

## 2. An Actual Belief, Even If Unreasonable

The mitigation of a violent assault in defense of others down to the imperfect level of defense of others would come into play if the defendant had an actual belief in the presence of an imminent and immediate threat even if that belief were unreasonable. By not testifying, of course, this appellant never provided any insight into the precise contours of his actual personal belief in the danger to Cache Irvin, if any, posed by Roderick Daniels. The burden of generating the issue, of course, was on the appellant. The primary source as to what the appellant was thinking was obviously the appellant himself. If he chooses not to tell us, that makes his generating an issue as to what he was thinking far more difficult.

## 3. The Footprints Of An Aggressor

---

[4] At one point in the appellant's brief, he refers not to a "knocking" on the door, but to a "pounding" on the door. Is it the case that Detective Fraser "knocks" on doors but Roderick Daniels "pounds" on doors? Are there levels of "knocking"? Or are there simply levels of "writing" about "knocking"?

31

Just as in the case of self-defense, it is also a prerequisite of the defense of others that the defendant should not have been the aggressor. An aggressor may not assert the defense of others. From his angry and confrontational arrival at the scene to his precipitous departure from the scene, the uninterrupted itinerary of this appellant was the classic track of an aggressor. The appellant was clearly not there seeking détente.

Surveillance footage showed that the appellant arrived at the scene and exited his car at 10:54 P.M. At 10:55 P.M. the footage showed that the appellant started running toward Daniels and Ouedraogo, that he took out his gun with an extended magazine, and that he can be heard yelling, "Yo, why y'all knocking on this door?" Daniels' voice can be heard twice explaining that keys had been left in the door. The appellant can then be seen fleeing the scene, gun in hand, at 10:56 P.M.

At the midpoint of that two-minute foray, the appellant fired seven bullets into the body of Roderick Daniels, killing him in the process. He then fired five unanswered bullets into the body of Ouedraogo. The appellant now seeks to justify (or at least to mitigate) this lethal attack (or attacks) on the ground that he was legitimately defending another from a deadly and serious attack. The appellant, however, never deigned to mention what he did or why he did it. He simply asks us to infer it.

The evidence did not remotely generate any genuine jury issue that the appellant, as he fired a total of twelve bullets into the bodies of Daniels and Ouedraogo, was entertaining the honest and reasonable belief that he was acting in defense of another person who was in imminent fear of death or serious bodily harm. Such "other person" was not even on the scene. Every step the appellant took was the step of an aggressor. Every word the appellant

32

spoke was the word of an aggressor. Every bullet the appellant fired was the uninterrupted crescendo of that aggression. The appellant's status as an aggressor cannot rationally be challenged. As the aggressor he cannot claim the defense of others as an issue.

## 4. What Is A Reasonable Response?

From the vantage point of Cache Irvin, if she truly believed that she and her baby were in imminent and immediate danger of death or grievous physical harm, would not her reasonable response had been to call the police rather than to call the appellant? From the vantage point of the appellant, if he truly credited the veracity and the content of such a call from Cache Irvin, would not his reasonable response have been to call the police rather than to assume the role of self-appointed vigilante? Did he, for instance, have arrest powers? In asserting a defense based on the defense of others, the would-be defender is enjoined to respond reasonably. Did he?

## 5. More Force Than Was Necessary: An Immoderate And Excessive Response

Putting aside any issue about calling the police, the fourth factor in the four-factored paradigm of the defense of others is that the defendant used no more force than was reasonably necessary in light of the threatened or actual force that was facing the "other" person to whose defense he was coming. The appellant woefully failed to generate a genuine jury issue that the seven bullets he fired into the body of Roderick Daniels were not more than was reasonably necessary to ward off any perceived danger to the safety of Cache Irvin posed by Daniels. Cache Irvin was not even in the face-to-face presence of Daniels. She was inside her apartment behind a closed door.

If the appellant's purpose had been to protect Cache Irvin from imminent harm, he never paused, moreover, to inform her, before taking off, that any threat to her had been abated, "Cache, you can come out now. He's dead." On the possible issue of any ostensible threat that Daniels posed to the life or safety of Cache Irvin, the amount of force used by the appellant was indisputably more than was reasonably necessary.

In this case and on the specific subject of the defense of others, in four distinct factual regards, the appellant failed to generate a genuine jury issue with respect to the defense of others. Under those circumstances, no jury instruction on that subject was required. We affirm.

## C. Mistake Of Fact

The third sub-contention of the appellant's broader jury instruction contention concerns the defense of Mistake of Fact. The Pattern Jury Instruction requested by the appellant is MPJI-Cr 5:06, Mistake of Facts. It reads:

> You have heard evidence that the defendant's actions were based on a mistake of fact. Mistake of fact is a defense. You are required to find the defendant not guilty if:
>
> > (1) the defendant actually believed (<u>alleged mistake</u>);
> >
> > (2) the defendant's belief and actions were reasonable under the circumstances; and
> >
> > (3) the defendant did not intend to commit the crime of (<u>crime</u>) and the defendant's conduct would not have amounted to the crime of (<u>crime</u>) if the mistaken belief had been correct, meaning that, if the true facts were what the defendant thought them to be, the [defendant's conduct would not have been criminal] [defendant would have the defense of (<u>defense</u>)].

In order to convict the defendant, the State must prove beyond a reasonable doubt that at least one of the three factors was absent.

The leading authority in our caselaw on the defense of mistake of fact in Maryland is Judge Raker's magisterial analysis of the subject in <u>General v. State</u>, 367 Md. 475, 789 A.2d 102 (2002). The precise issue before our Supreme Court in <u>General</u>, 367 Md. at 478, was precisely the issue now before us on this sub-contention:

> The single question that he raises is <u>whether the trial court erred in refusing to instruct the jury concerning mistake of fact as a defense</u>.

(Emphasis supplied).

The question before our Supreme Court, was, as is the question now before us, that of whether the factual evidence in the case actually generated a genuine jury issue raising the question of an actual mistake of fact:

> <u>Defense counsel requested the Maryland State Bar Association, Inc., Criminal Pattern Jury Instruction (MPJI-Cr) 5:06</u>, which addresses the mistake of fact defense. <u>The trial court denied the request</u>, stating that such an instruction was not applicable under the factual scenario of the case.

367 Md. at 480. (Emphasis supplied).

Judge Raker pointed out, 367 Md. at 483-84, that mistake of fact is a recognized common law defense:

> As a general rule, <u>mistake of fact is a recognized common law defense</u> to certain crimes…<u>Mistake or ignorance of fact exists when the actor does not know what the actual facts are or believes them to be other than as they are. In essence, a mistake of fact is a defense when it negates the existence of the mental state essential to the crime charged</u>.

(Emphasis supplied).

35

The essence of the mistake of fact defense is that it negates the required <u>mens</u> <u>rea</u> of a guilty defendant. Chief Judge Robert Murphy had earlier explained for the Maryland Supreme Court in <u>Garnett v. State</u>, 332 Md. 571, 577-78, 632 A.2d 797 (1993):

> <u>At common law, a crime occurred only upon the concurrence of an individual's act and his guilty state of mind</u>. In this regard, it is well understood that generally there are two components of every crime, <u>the actus reus or guilty act and the mens rea or the guilty mind or mental state accompanying a forbidden act</u>. <u>The requirement that an accused have acted with a culpable mental state is an axiom of criminal jurisprudence</u>.

(Emphasis supplied).

The ultimate question is that of whether the factual evidence in this case has generated a genuine jury issue with respect to a mistake of fact actually having been made by this defendant which, if true, would negate his <u>mens</u> <u>rea</u>. <u>General v. State</u>, 367 Md. at 486-87, again explained:

> <u>Whether a particular instruction must be given depends upon whether there is any evidence in the case that supports the instruction; if the requested instruction has not been generated by the evidence, the trial court is not required to give it</u>. Whether the evidence is sufficient to generate the requested instruction in the first instance is a question of law for the judge.

(Emphasis supplied) (Internal citations omitted).[5]

---

[5]     This thin two-page slice of appellate brief should be surgically confined, as its subtitle clearly promises, to the mistake of fact defense. With regularity, however, the appellant broadly asserts it as but a part of an omnibus agglomeration of self-defense, the defense of others, and mistake of fact. The discussion wanders back and forth among these defenses. These, however, are distinct defenses with distinct controlling rules.

We have already analyzed at great length both self-defense and the defense of others. We will not repeat those analyses here. At this stage of our analysis, we will examine the mistake of fact defense and nothing else. To go "off sides" or "out of bounds" is an analytic infraction. To invoke a self-defense factor when analyzing the mistake of face defense is to go "off sides." To invoke a defense of others factor when analyzing the

## 1. Whose Mistake Of Fact
## Has Been Generated As An Issue?

An unknown fact is not a mistake of fact. This appellant claims that he made a mistake of fact, which, if true, would have negated his <u>mens rea</u> for the second-degree murder of Roderick Daniels (and perhaps for the attempted second-degree murder of Ouedraogo). Was such a mistake of fact by the defendant, however, ever generated as a genuine jury issue by the actual evidence in this case? We think not.

In his appellate brief, the appellant allots just less than two pages to his discussion of his mistake of fact defense. Seventy-five percent of this total discussion is simply a recitation of mistake of fact law generally. Approximately one-half of one page is devoted to the facts of this case. The sum total of the appellant's relevant factual recitation and argument consists of the following:

> From the evidence adduced at trial, the jury could construct the following scenario:
>
> - <u>Ms. Irvin believed that someone was repeatedly banging on her door that night to try and harm her and/or her child</u>. She did not answer the door out of fear, and she contacted Appellant and asked him to come over and protect her and address the situation. When he arrived, he found two men outside her apartment, one of whom was holding a metal object, and yelled out at them about knocking on Ms. Irvin's door. One of the men – the one holding the metal object – was yelling back at him.
>
> - He had no idea that Ms. Irvin had left her keys in the door, and no idea that Mr. Daniels was merely trying to return them to her.

---

mistake of fact defense is to go "off sides." We recognize three distinct defenses. We do not, however, recognize a bloated omnibus combination of these three defenses. These defenses do not melt into each other. In driving the discussion, one should stay within one's well-marked analytic lane.

> This scenario implicates defense of others, self-defense, and <u>mistake of fact (as to the reason Mr. Daniels was knocking on Ms. Irvin's door)</u>.

(Emphasis supplied).

Out of this agglomeration of largely external facts the appellant proposes to construct his mistake of fact defense. The construction of that defense, however, has a strange beginning. The heart of the defense is an actual mistake of fact in the mind of the defendant. It is the defendant, of course, with whom we are exclusively concerned because it is the defendant who, if the mistaken fact had been true, would be exonerated in terms of his <u>mens</u> <u>rea</u>.

As the appellant, however, sets out to state this primary and required predicate for the mistake of fact defense, he takes us not into the mind of the appellant but into the mind of Cache Irvin. "<u>Ms. Irvin believed that someone was repeatedly banging on her door that night to try and harm her and/or her child</u>." (Emphasis supplied). That was the critical mistake of fact, according to the appellant, that triggered this entire criminal incident. It was a mistake of fact, however, on the part of Cache Irvin, not a mistake of fact on the part of the appellant. In summing up the agglomeration of largely external facts, the appellant, in parentheses, makes it clear that the critical mistake of fact he is depending upon is "the reason Mr. Daniels was knocking on Ms. Irvin's door." As the appellant argues, "This scenario implicates defense of others, self-defense, and mistake of fact (as to the reason Mr. Daniels was knocking on Ms. Irvin's door)." All of this, of course, refers to a mistake of fact made by Cache Irvin, not to a mistake of fact made by the appellant. The mistake of fact defense contemplates a mistake of fact made by the appellant himself, not a mistake

38

of fact made by someone else. A genuine jury issue implicating this defense was simply not generated and no jury instruction was called for.

Even if, arguendo, Cache Irvin's brain rather than the appellant's brain had been the appropriate locus for the mistake of fact to occur (it was not), a genuine jury issue implicating the mistake of fact defense still would not have been generated. Something more was required. The second factor of mistake of fact's multi-factored paradigm strictly requires that the mistake was reasonable under the circumstances.

To qualify as a valid defense, the mistaken belief cannot be due to the defendant's "laxness or lack of diligence on his part to ascertain the facts." Braun v. State, 230 Md. 82, 90, 185 A.2d 905 (1962). As this Court made clear in Clarke v. State, 9 Md. App. 570, 573, 266 A.2d 359 (1970), an individual with an unlawful purpose in mind who deliberately "shuts his eyes" to avoid knowing what would otherwise be obvious, acts at his own peril and is treated as having knowledge of the actual facts.

A knocking on one's apartment door, even late at night, does not ipso facto give rise to a rational fear that the person doing the knocking intends to harm the resident and/or the resident's child. This is especially so when the knocking, after initially getting no response, is followed not by an attempt to break in, or even by a trying of the door, but by a second knocking followed by a third knocking followed by a fourth. It could have been the superintendent of the building. It could have been a neighbor trying to borrow a cup of sugar. It could have been an overly intrepid seller of Girl Scout cookies. Even through the closed door, moreover, certain minimal conversation was possible. "Who's there?" "Go

39

away or I will call the police." The apprehension of imminent or immediate harm was simply not an inevitable rational conclusion.

Even if, arguendo, we could transplant the mistake of fact from Cache Irvin's brain to the appellant's brain as he raged like a vigilante on the outside, there would be even less reason for him to indulge in such fearful speculation. He would have observed that the door to Cache Irvin's apartment was still closed. He would have rationalized that the knocking on the door had been followed by a second knocking and then by a third and then by a fourth. Somewhere in that sequence, even a highly carbonated initial sense of imminence and immediacy would begin, at least slightly, to fizzle. As such carbonization fizzled, the reasonableness of the mistake of fact would have diminished with it. Imminence and immediacy can alternate. As they do, they lose some of their imminence and immediacy.

As the appellant initially came charging across the lawn like an avenging fury, he shouted the question, "Why are you knocking on my girl's door?" A videotape captured the scene of the confrontation. There were also bits of audiotape that were recorded. Those bits of audio recorded that in answer to the appellant's shouted question, Roderick Daniels at least tried to explain to the appellant that he was simply trying to alert Cache Irvin to the fact that she had inadvertently left her keys in the door knob. The appellant obviously chose to ignore that explanation. Within a few feet of where the two men were standing, moreover, Cache Irvin's door keys themselves were prominently dangling from the doorknob of the apartment. The appellant chose not to see them. Even if, purely arguendo, we could transfer the mistake of fact in Cache Irvin's brain into the appellant's brain, that

40

mistake of fact would still not have been reasonable under the circumstances clearly apparent to him.

As the door-knocking villain of Cache Irvin's mistaken and uninhibited imagination, Roderick Daniels proved to be, demonstrably, far less intrepid or hellbent for the slaughter of mother and child than he had originally been imagined to be. Just a few feet away, moreover, from where Daniels and the appellant stood toe to toe, yelling at each other, a bundle of unused door keys dangled prominently from the front doorknob. As every neutral augury proclaimed, "Friend, not foe," the appellant, swept up in the self-induced surge of his own fury, chose to ignore those auguries, just as he chose to ignore the explanation for his own Good Samaritanship twice proffered by Roderick Daniels. The appellant was obviously not looking for any rational answers.

In this case, mistake of fact was never generated as a significant jury issue. No jury instruction was called for on a non-existent issue.

## An Alternative Or Echo Scenario

In one sense, the circumstances of this case are so unusual that our hypothesizing of an alternative or echo scenario is irresistible. Immediately before shooting his victims, the appellant came roaring across the lawn like an avenging fury, shouting "Why are you knocking on my girl's door?" at precisely 10:55 P.M. Let us now hypothesize, however, that the appellant came roaring across the lawn like an avenging fury, shouting "Why are you knocking on my girl's door?" exactly fifteen minutes later at precisely 11:10 P.M. What might have been different? What might have been indistinguishably the same?

Let us hypothesize that, fifteen minutes earlier, Roderick Daniels had followed the example of Abdoul Ouedraogo and decided to call it a night and go to bed. He would have gone off to his own apartment, Unit B, and closed the door. In the meantime, Ouedraogo would have retired to his own apartment, Unit D. Also in the meantime, Cache Irvin, alarmed at the still insistent knocking on her door, had called the police and asked them to come and investigate. The police responded within ten to fifteen minutes. The stage would now be set for our echo scenario, fifteen minutes after the initial and actual scenario.

As the appellant came charging across the lawn fifteen minutes later, he would have seen an unknown male figure standing in front of Cache Irvin's door, just after having knocked on her door, precisely where he had seen Roderick Daniels standing fifteen minutes earlier. That male figure would now be Detective Steven Fraser. Standing unobtrusively nearby would have been Detective Fraser's wingman, the crime scene technician, Jerome Taylor. There is one slight difference. Whereas fifteen minutes earlier, the appellant might have seen an unidentified metal object in the grass near Roderick Daniels's feet or even, perhaps, in Roderick Daniels' hands, now, fifteen minutes later, the unidentified metal object might have been seen in Detective Fraser's holster. That situation may have enhanced the likelihood that the metal object was a gun.

In any event, if the appellant, under essentially indistinguishable circumstances, had, fifteen minutes later, fired seven bullets into the body of Detective Steven Fraser and an additional five bullets into the body of Jerome Taylor, would the appellant now be mounting the same three defenses? For Ouedraogo, fifteen minutes earlier, or for Jerome Taylor, fifteen minutes later, their only discernible involvement would seem to have been

42

the sin of proximity to suspicious people. Responding to a crime scene can be a dangerous enterprise.

Would the murder of Detective Fraser, fifteen minutes later, have been different in any legally significant way from the murder of Roderick Daniels, fifteen minutes earlier? Would the attempted murder of Jerome Taylor, fifteen minutes later, have differed in any legally significant way from the attempted murder of Abdoul Ouedraogo, fifteen minutes earlier? What would have been the legal difference? Even when "A Stranger Knocks," that is not good cause to shoot the stranger.

### "Who's That Knocking At My Door?"

And what of others similarly situated? Should the superintendent of the building be at risk? Should neighboring tenants in the building (such as, presumably, Roderick Daniels and Abdoul Ouedraogo)? Should the Avon Lady? Should the vendor of Girl Scout Cookies? Should an investigating policeman risk death simply by rapping at the door? Should any of them become eligible targets for the appellant's execution by snap judgment? Should "A Stranger Knocks" be repackaged as "When Anybody Knocks?" The appellant's feverish conclusion in that regard could brew a very dangerous cauldron in which even to ring a doorbell could be deadly. Judge Mays did not buy those hair-trigger possibilities. Nor do we.

### III. Contention Three:
### Constitutional Speedy Trial

The appellant's third contention is that he was denied his constitutional right to a speedy trial pursuant to the Sixth Amendment to the United States Constitution. That right,

43

as it is universally understood and applied today, is exemplified by <u>Barker v. Wingo</u>, 407

U.S. 514, 92 S. Ct. 2182, 33 L.Ed.2d 101 (1972). <u>Griffin v. State</u>, 262 Md. App. 103, 317

A.3d 415 (2024).

Absolutely central to a <u>Barker v. Wingo</u> analysis is an ultimate inter-balancing of

no less than four critical factors. The Supreme Court laid them out, 407 U.S. at 530:

> <u>A balancing test</u> necessarily compels courts to approach speedy trial cases
> on an ad hoc basis. We can do little more than identify some of the factors
> which courts should assess in determining whether a particular defendant has
> been deprived of his right. Though some might express them in different
> ways, <u>we identify four such factors: Length of delay, the reason for the delay,
> the defendant's assertion of his right, and prejudice to the defendant.</u>

(Emphasis supplied).

In <u>State v. Wilson</u>, 35 Md. App. 111, 114, 371 A.2d 140 (1977), this Court, early

on, characterized <u>Barker v. Wingo</u> as "the star by which we steer." At 35 Md. App. 115-

16, we elaborated:

> That case is the touchstone to which we shall return and return and return
> again in testing the facts at hand against its informing standards.

**The Right To A Speedy Trial:**
**A Softer Science**

Whereas constitutional law generally may take various shapes and forms, that taken

by the Sixth Amendment right to a speedy trial is highly unusual. Speedy trial law is the

most subjective member of the constitutional law genre. Whereas many constitutional law

problems produce results that are mathematically or logically absolute, the conclusions of

speedy trial analysis are frequently only feelings, senses, or impressions. The impression

of one speedy trial analyst, moreover, may not be the same as that of a different speedy

44

trial analyst. This is, indeed, <u>ad hoc</u>. As Judge Orth noted for the Maryland Supreme Court

in <u>State v. Bailey</u>, 319 Md. 392, 414-15, 572 A.2d 544 (1990):

> Common to all speedy trial cases decided by the Supreme Court and this Court is the recognition that the speedy trial right is unique, that it is indeed "amorphous" and "slippery," that it is impossible to determine with precision when the right has been denied, and that the balancing test adopted by the Supreme Court is difficult to apply, no one factor being dispositive. All the cases emphasize that in the determination of the speedy trial question, each case rests on its own facts.

This is why the caselaw characterizes many speedy trial conclusions as <u>ad hoc</u>. It is

a soft science. The very language of speedy trial law analysis is basically not conducive to

the use of absolute terms. The Aristotelian syllogism is not a common feature of speedy

trial analysis. From such less than substantial predicate, however, we are fully expected to

pronounce an affirmative holding in this case. As we probe for "the feeling," "the sense,"

"the impression" produced by <u>Barker v. Wingo</u>'s four-factored balancing, we will look first

at the length of delay as a key factor.

### Computing The Length Of Delay
### In Light Of Superseding Suspensions

In the caselaw generally, the standard and widely accepted definition of the length

of delay has always been from the day of the defendant's arrest to the opening day of the

defendant's trial. In this case, the appellant was arrested on June 20, 2020. His trial began

on February 21, 2023. Those calendar dates yield a gross or presumptive length of delay,

standing alone, of two years and eight months. For purposes of <u>Barker v. Wingo</u>'s four-

factored speedy trial balance, that gross length of delay would ordinarily enter into the

analysis. In his speedy trial argument in this case, the appellant relies heavily on that gross

length of delay of two years and eight months. That length of delay, however, is not an immutable figure. It may be superseded. In this case it was superseded.

In this case there was an extraordinary and superseding circumstance that rendered that ordinary length of delay measurement inadequate for a speedy trial assessment. Over the course of the several year period between the appellant's arrest and the appellant's trial in this case, the world, including the United States and the State of Maryland, was suffering from a global Covid-19 pandemic. In order to alleviate the contagious impact of that pandemic, the Chief Judge of the Supreme Court of Maryland[6] issued several statewide orders that all jury trials would be suspended during certain periods. Accordingly, no juries would be available and, therefore, no jury trials could be held. Of pertinence to this case, the first such suspension of jury trials ran from March 16, 2020 through October 4, 2020, a period of six months and eighteen days. By repeat order of the Chief Judge, a second such period of jury trial suspension ran from November 16, 2020 through April 25, 2021, a period of five months and nine days. A third suspension of jury trials ran from December 29, 2021 through March 6, 2022, a period of two months and eight days. Those three suspensions added together meant that this appellant, who was constitutionally entitled to trial by jury, did not actually enjoy that entitlement to a jury trial for a total period of fourteen months and six days.

In terms of getting this case to the trial table promptly within a constitutionally mandated time limit, what looked initially like a gross length of delay of two years and

---

[6] On December 14, 2022, the name of the Court of Appeals was changed to the Supreme Court of Maryland.

eight months was thereby reduced, for purposes of <u>Barker v. Wingo</u>'s four-factored balancing test, to an operational net length of delay of only one year and six months. Beyond that more limited period when a jury trial was even possible, the running of the speedy trial clock was tolled. The calendar stopped running. Time in effect stood still.

For purposes of assessing a speedy trial claim, it is first the job of the trial court and then the function of appellate review to examine the performance of the three entities whose responsibility it is to get a case to the trial table. Those entities are 1) the prosecutor, 2) the defense, and 3) the circuit court system itself, in this case the court system of Baltimore City. None of those three entities, however, was responsible for the statewide suspensions of jury trials mandated by the orders of the Chief Judge of the Supreme Court of Maryland. An adjustment needed to be made.

Just as this Court possesses the unquestioned jurisdictional authority to assess the performance of the prosecutor and of the appellant in this case, it also possesses the jurisdictional authority to assess the performance of the court system of Baltimore City. The underlying court system, of course, bears some of the responsibility for guaranteeing a defendant a speedy trial. Were enough courtrooms available to handle the trial load? Were enough judges available? Were enough supporting personnel available? Was courtroom electricity and heat and light adequate for trial? The court system itself may thus sometimes be held responsible for the denial of a speedy trial.

The jurisdictional authority of such appellate review, however, does not extend to assessing the performance of the Chief Judge. We do not presume to assess the adequacy of the performance of the Chief Judge in ordering the statewide suspension of jury trials.

47

For purposes of the four-factored <u>Barker v. Wingo</u> analysis, the reasonableness of that length of delay during the period of the statewide suspension of jury trials is beyond our authority to review. We can only assess the net length of delay attributable to the prosecution, the defense, and the Circuit Court of Baltimore City, not the gross length of delay attributable in part to the superseding authority of a higher governmental order. It is not within our province either to blame the Chief Judge of the State for a speedy trial violation or to absolve the Chief Judge from such blame. Either way, it would be beyond our paygrade.

In his Order on Covid-19 suspension, filed on March 28, 2022, Chief Judge Joseph Getty made clear the effect that a statewide suspension would have by way of tolling the running of various statutes of limitation and other time limits:

(e) <u>In tolling the statutory and rules deadlines related to the start of criminal jury trials and other criminal matters</u>, the *Administrative Order on Expanding the Statewide Suspension of Jury Trials and Suspending Grand Juries*, <u>filed April 3, 2020, provided that statutory and rules deadlines related to the adjudication of pending criminal matters were to be suspended and extended by the number of days that the courts were closed to the public</u>; and

(f) <u>For the purposes of this Order, "tolled or extended by the number of days that the courts were closed" means that the days that jury trials were not able to be offered to criminal defendants due to the COVID-19 emergency</u> during the periods beginning March 16, 2020, through October 4, 2020; November 16, 2020, through April 25, 2021; and December 29, 2021 through March 6, 2022, pending further Order of the Chief Judge of the Court of Appeals<u>, do not count against the time remaining for the start of a criminal jury trial</u>; and

(g) <u>The resumption date of criminal jury trials further shall serve as the resumption date for days to be counted toward any adjusted deadline for the start of any trial pursuant to</u> Section 6-103 of the Criminal

> Procedure Article and Rule 4-271(a)(1), <u>commonly known as the</u>
> <u>*Hicks* date</u>[.]

(Emphasis supplied).

Thus, the running of the clock for <u>Hicks</u>' 180 day time limit is tolled. The running of the clock for statutes of limitations is similarly tolled. The running of the clock generally is tolled. Speedy trial law is a form of limitations. For purposes of this analysis, the applicable length of delay, therefore, will be the net length of delay of one year and six months and not the gross length of delay of two years and eight months. The running of the clock for that longer length of delay is tolled.

## The Language Of Subtraction

There are thus two very different lengths of delay that could theoretically be applied to <u>Barker v. Wingo</u>'s four-factored balancing process. There is the gross length of delay which follows the standard definition of "length of delay" in the caselaw without regard to any superseding order from a higher governmental authority. There is also, however, the net length of delay which reduces the calculable trial calendar pursuant to the mandate of the superseding order from a higher governmental authority. It is this latter net length of delay that we find to be an applicable factor in the speedy trial analysis now before us.

In the overwhelming majority of the speedy trial cases, the standard definition of "length of delay" is perfectly dispositive. The length of delay is the length of delay and that's it. It is only in a relatively rare case, such as this one, involving a superseding and unreviewable order from a higher governmental authority that the standard definition of "length of delay" needs to be modified. That superseding governmental order begins with

49

the original number of available trial days and then reduces that figure by the number of trial days covered by the order of suspension. Involved is the basic arithmetic function of subtraction.

The standard definition of length of delay gives us the minuend, the larger number of trial days from which there will be reduced or suspended a lesser number of those trial days. That original minuend is the gross length of delay. That minuend or gross length of delay embraced in this case a time period of two years and eight months.

The number of days by which the minuend will be reduced is the subtrahend, the number of days covered by the superseding order (or orders) of suspension. That subtrahend, representing the total of all three superseding suspensions of jury trials, consisted of fourteen months and five days.

Once that subtrahend is subtracted from the minuend, what we are left with is the remainder, the reduced trial calendar which we will subject to Barker v. Wingo's four-factored analysis. We will refer to that remainder as the net length of delay. This is the modification to the standard definition of length of delay made necessary by the relatively rare superseding impact of an order of suspension. Following the mandated reduction or suspension of available trial days, that remainder or net length of delay was one of one year and six months. That modified or net length of delay is one of the four factors that enter into our ultimate Barker v. Wingo balancing of factors.

## The Length Of Delay:
## Its Qualitative Significance

For the speedy trial analysis now before us then, our pertinent length of delay is the net length of delay of one year and six months. We are looking at the length of delay, of course, in its substantive function as one of the four factors bearing on the ultimate speedy trial merits and not in its procedural and gatekeeping function as qualifying the case for Barker v. Wingo analysis. The distinction between those two functions we thoroughly explored in Griffin v. State, 262 Md. App. 103, 157, 317 A.3d 415 (2024):

> In speedy trial analysis, the factor that is called "length of delay" is, confusingly, a bit of a doppelganger. It has not one but two separate identities, each serving a different function or purpose on different occasions…As a factor, the "length of delay" has two distinct functions. There is a procedural function. There is also an ultimately substantive function.

(Emphasis supplied).

As one of the four factors bearing on the ultimate speedy trial merits, the length of delay has only slight significance. As Griffin v. State further observed, 262 Md. App. at 156:

> On that ultimate question [the ultimate merits], the length of delay will actually have relatively little impact.

(Emphasis supplied). *See also* State v. Kanneh, 403 Md. 678, 688, 944 A.2d 516 (2008) ("In the weighing process on the ultimate merits of speedy trial compliance, the 'length of delay' factor is actually of slight significance."); Glover v. State, 368 Md. 211, 224-25, 792 A.2d 1160 (2002) ("The length of delay, in and of itself is not a weighty factor."); Erbe v. State, 276 Md. 541, 547, 350 A.2d 640 (1976) ("Delay is the least conclusive of the four factors identified in Barker.").

**The Length Of Delay:**

**Its Quantitative Significance**

Simply as a significant chunk of the trial calendar, the net length of delay in this case was one of one year and six months. Of the factors that enter into Barker v. Wingo's four-factored balancing analysis, the appellant relies almost exclusively on this length of delay factor to establish per se his claim to a denial of his constitutional right to a speedy trial. Barker v. Wingo itself, however, gainsays any such automatic reliance on the length of delay factor standing alone, to establish a constitutional violation.

In Barker v. Wingo, Barker was arrested "shortly after" July 20, 1958. He was ultimately tried on October 9, 1963. The length of delay was thus one of five years and approximately two to three weeks. This was almost quadruple the net length of delay in this case. The Supreme Court ultimately held that that length of delay of just over five years did not establish per se a constitutional violation. Neither does a length of delay of one year and six months in the case before us.

The Maryland caselaw stands for the same balancing. In Wilson v. State, 281 Md. 640, 382 A.2d 1053 (1978), "[t]he elapsed time period between Wilson's arrest and the hearing on his speedy trial claim was a few days short of four years and two months." 281 Md. at 651. That was just several months short of twice the net length of delay in this case. At 281 Md. 663, the Supreme Court of Maryland concluded:

> Applying the balancing test by assessing the four factors relevant in determining whether Wilson was deprived of his right to a speedy trial in the circumstances of the delay here, the conclusion that he was not denied the right is crystal clear.

(Emphasis supplied).

In State v. Kanneh, 403 Md. 678, 684, 944 A.2d 516 (2008), the length of delay was that of 33 months, just one month short of twice the length of delay in the case before us. Judge Greene wrote for the Supreme Court of Maryland:

> We shall hold that the 35 month delay in this case, while of sufficient length to require us to engage in a speedy trial analysis, does not justify a conclusion that Kanneh's right to speedy trial was violated.

(Emphasis supplied).

The two-year length of delay in State v. Bailey, 319 Md. 392, 572 A.2d 544 (1990) and the 14-month length of delay in Glover v. State, 368 Md. 211, 792 A.2d 1160 (2002) were both comparable to the length of delay in this case. In both cases, the Supreme Court of Maryland held that the defendant's right to a speedy trial had not been violated.

So much for the significance of the length of delay factor per se as a measurable chunk out of the trial calendar.

## The Seriousness Of The Case At Trial

There is, however, yet another factor that can sometimes diminish the weight of the length of delay factor – the seriousness of the case being tried. As Barker v. Wingo itself pointed out, 407 U.S. at 531, the "length of delay that can be tolerated for an ordinary street crime is considerably less than [for] a serious, complex conspiracy charge."

It is desirable, of course, that a criminal defendant enjoy the right to a speedy trial. It is also desirable that one charged with a crime stand trial for that crime. Those desiderata, however, may sometimes be in conflict. By what ad hoc balancing test must society resolve that conflict? On balancing, society may well decide that it will let a traffic violator or even a small time misdemeanant go unpunished rather than violate a constitutional protection.

53

Society might also decide, however, not to be so lenient with a first-degree murderer. That is why decisions in this corner of constitutional rights law are referred to as ad hoc. They are not mathematical or automatic. They are not routinely predictable. They are subjective judgments that can shift with the circumstances.

The case now before us, of course, was not a trial for a traffic offense or for a low-level misdemeanor. The appellant was being tried for the first-degree murder of Roderick Daniels, and, as a separate and distinct offense, for the attempted first-degree murder of Abdoul Ouedraogo. These are weighty factors in the balancing process. They weigh against the finding of a substantial violation.

### The Reason For The Delay

Once the length of delay has been determined, the second of Barker v. Wingo's four interacting factors becomes the reason for that delay. Who, if anyone, was responsible for the delay? As in the case now before us, the reason for the delay is frequently a relatively insignificant factor. Countless and unpredictable neutral circumstances slow down the progress of many trials and blame cannot be attributed to either the State or the defendant. The reason for the delay can frequently be described simply as "neutral."

There is, however, one villain that must be scrupulously avoided. Barker v. Wingo set it out at 407 U.S. 531:

> Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the

defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

(Emphasis supplied).

In <u>Jones v. State</u>, 279 Md. 1, 6-7, 367 A.2d 1 (1976), the Supreme Court of Maryland spoke to a similar effect:

A continuum exists whereby <u>a deliberate attempt to hamper the defense would be weighed most heavily against the State</u>, a prolongation due to the negligence of the State would be weighed less heavily against it, <u>a delay caused by a missing witness might be a neutral reason chargeable to neither party</u>, and a delay attributable solely to the defendant himself would not be used to support the conclusion that he was denied a speedy trial.

(Emphasis supplied) (Cleaned up).

In the case now before us, the reason for any delay is a factor of almost no significance. Neither the State nor the appellant was remotely guilty of a "deliberate attempt to delay the trial" in order to gain some strategic advantage. At worst, the State was forced to ask for several trial delays because of staffing deficiencies in the State's Attorney's Office. That is not, however, a sinister motivation. On one occasion, the prosecutor assigned to try the case was unavailable because of an unexpected and superseding military obligation. This was automatically dismissed as a "neutral" reason with a sharp salute. In any event, the reason for any delay was not a significant factor in the ultimate <u>Barker v. Wingo</u> balancing on the ultimate speedy trial merits.

The logistical problems that have to be overcome by all parties – the State, the defendant, and the Courts – before a case is ready for trial are myriad. The caselaw recognizes this inherent complexity and is accordingly tolerant. Appellate discussions of this complexity of assessing the reason for delay give the flavor of the court's

understanding of the nature of the problem. *See*, e.g., <u>Glover v. State</u>, 368 Md. 211, 226, 792 A.2d 1160 (2002):

> The first factor – <u>the unavailability of a judge</u> – <u>is clearly a neutral reason</u>. While the State will be held accountable for this factor, it <u>will not weigh heavily against the State</u>. The second factor – the unavailability of the DNA test results – is a valid justification in these circumstances. DNA evidence is highly technical, often requiring courts to allow more time for completion of the tests and review, by both parties, of the results…<u>In regard to the State's *initial* request for postponement, we find no evidence that the State failed to act in a diligent manner and therefore, we conclude that these grounds for the postponement were both neutral and justified</u>.

(Emphasis supplied) (Internal citations omitted). *See also* <u>State v. Kanneh</u>, 403 Md. 678, 691-92, 944 A.2d 516 (2008):

> The unavailability of an interpreter is analogous to <u>the problem of overcrowded courts, which we have noted is a "more neutral reason" that should be "weighted less heavily"</u> but considered nonetheless.
>
> <u>Because the unavailability of an interpreter was not the result of bad faith, this delay is not weighed against the State</u>.
>
> ….
>
> The case was postponed one final time when the trial judge noted that the only interpreter who had been located had recently undergone surgery when the parties met for a motions hearing on February 16, 2007, and as a result was experiencing severe discomfort. This delay is attributable to the unavailability of an interpreter, and <u>because it was not the result of any bad faith, if weighed against the State, it is only slightly</u>.

(Emphasis supplied) (Internal citations omitted).

## Demand–Waiver:
## A Necessary Part Of The Drill

The demand-waiver rule is a core factor in <u>Barker v. Wingo</u>'s ultimate speedy trial analysis. If a delayed trial is threatening a defendant's liberty or his job or his marriage or

his monetary solvency, speedy trial law fully expects that defendant to complain – loudly and repeatedly. That expected complaint is, after all, the necessary mechanism by which the courts are alerted to the very existence of a problem.

If that defendant fails to complain, that defendant may fail to qualify for any speedy trial relief. Absent at least some complaint, there is a waiver of the entire speedy-trial contention. It is, as a truism, the squeaky wheel that gets the grease. It is the intensity of the squeaking, moreover, that will at least influence the dosage of the grease. The adequacy of that complaint is the sub-contention now before us. <u>Barker v. Wingo</u>, 407 U.S. at 531-32, spoke of the impact of a complaint:

> <u>The more serious the deprivation, the more likely a defendant is to complain</u>. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.

(Emphasis supplied).

In the case now before us, the appellant did technically file a request for a speedy trial. He did so, however, only as a part of a prefabricated pro forma pleading embracing a comprehensive list of a wide variety of trial rights, some pertinent to the case at hand and others as mere abstractions covering a broad spectrum of issues that could arise in criminal trials generally. Well-prepared defense attorneys frequently prepare such a formal pleading that can then be used in a wide variety of future cases. The inclusion of a request for a speedy trial in such a pro forma pleading does serve the salutary purpose of avoiding a charge by the prosecution that the defendant has waived the right even to raise the speedy

trial issue on appeal as if the defendant had been completely silent on that issue at trial. The pleading forestalls such a charge of waiver.

That was the factual situation in the case at hand. In the course of the trial, the appellant's desire for a speedy trial was never mentioned, by way of demand, request, or complaint. With respect to any particularization in any form, the appellant relies exclusively on having raised the issue in the course of his pro forma pleading.

The question before us is that of how much weight to attach to such an omnibus pro forma pleading standing alone without any supporting particularization. In <u>Barker v. Wingo</u>, 407 U.S. at 529, the Supreme Court was disdainful of such a formal pleading, standing alone, as it commented on the duty of the trial court:

> It would also allow a court to weigh the frequency and force of the objections <u>as opposed to attaching significant weight to a purely pro forma objection</u>.

(Emphasis supplied). *See also* <u>Glover v. State</u>, 368 Md. 211, 228, 792 A.2d 1160 (2002); <u>Lloyd v. State</u>, 207 Md. App. 322, 332, 52 A.3d 161 (2012) (Speedy trial requests in omnibus filings carry only slight weight.).

Because of its utility in forfending a charge of waiver, the inclusion of a request for a speedy trial in a pro forma motion is not NOTHING. Because of the total absence of any further particularization, however, its weight is NEXT TO NOTHING.

### Out Of One Context And Into Another
### "Is It Rainy Enough To Order The Evacuation Of New Orleans?"

In speedy trial law, the cardinal transgression is to lift a statement out of a quiet context where it lies comfortably pertinent and to attempt to inject it into a far different and more turbulent context where it may have little or no pertinence at all. Linguistically and

58

logically, that is the mortal sin. This is especially a problem in speedy trial law because many speedy trial problems frequently turn out to be double-barreled or hybrid inquiries.

The double-barreled nature of numerous speedy trial inquiries is a given. Barker v. Wingo itself, 407 U.S. at 530, recognized the hybrid or dual nature of the length of delay factor. It distinguished the purely procedural nature of the inquiry or function from the substantive nature of the inquiry on the ultimate speedy trial merits:

> The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.

(Emphasis supplied).

In Griffin v. State, 262 Md. App. 103, 157, 317 A.3d 415 (2024), this Court expanded on Barker v. Wingo's "triggering mechanism:"

> The first of those functions is simply as a "triggering mechanism" for the ultimate four-factored Barker v. Wingo analysis. A party is not entitled to a Barker v. Wingo four-factored analysis simply by asking for one. One must qualify for such an analysis. For that qualifying function, the court typically looks to the "length of delay" in its procedural manifestation.

(Emphasis supplied).

In Doggett v. United States, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), the Supreme Court referred to that gatekeeping role as a part of the "length of delay" factor's "double inquiry:"

> The first of these is actually a double enquiry. Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial had crossed the threshold dividing ordinary from "presumptively prejudicial" delay.

(Emphasis supplied).

In State v. Wilson, 35 Md. App. 111, 147, 371 A.2d 140 (1977), we explained the hybrid function of the length of delay factor:

> 'Delay' within the contemplation of Barker v. Wingo is a hybrid. It is both the mechanism which triggers analysis and then a factor in that analysis which it has triggered. It straddles the line between the decision to analyze and the analysis itself.

(Emphasis supplied).

The "triggering mechanism," of course, does not resolve the question of whether a defendant's constitutional right to a speedy trial was or was not violated. It settles only the preliminary and procedural inquiry of whether the four-fold balancing of Barker v. Wingo should be invoked to help resolve the larger constitutional question. Both the preliminary or procedural triggering function and the substantive function of weighing the ultimate constitutional merits involves a very different analytic context and the one must never be confused with the other.

Double-barreled inquiries, of course, double the number of contentions that need to be addressed; each inquiry generating its own contention. Doubling the number of contentions, moreover, then doubles the number of contexts in which those contentions will be analyzed and resolved. Doubling the contexts, in turn, increases exponentially the chance that those contexts may become confused and intermingled with each other. The problem is basically one of too many contexts. The initial double-barreled inquiry ultimately generated two different contentions and thus, two different contexts in which to analyze those two different contentions. The contexts must not be confused with each other.

The basic rule is "**DO NOT TAKE A THING OUT OF ITS ORIGINAL CONTEXT AND ATTEMPT TO INSERT IT INTO A DIFFERENT CONTEXT**." Why is this so? A full understanding of the concept of "length of delay" as a factor in speedy trial analysis requires a thorough understanding of basic, underlying grammar. Length of delay is a hybrid inquiry, involving an examination of the length of delay's procedural or triggering function and, quite distinctly, an examination of its ultimate substantive significance. A nagging problem has been that the analytic caselaw foolishly used the same vocabulary – the adjective "prejudicial" and the adjectival phrase "presumptively prejudicial" – in its examination of both prongs of that hybrid inquiry. This foolish usage in turn led to the fallacious conclusion by many that the phrase means the same thing in each of its contexts. Such, however, is not the case.

"Prejudicial," of course, is an adjective. The fuller phrase "presumptively prejudicial" is simply an adjectival phrase as a descriptive term. An adjective needs a noun (or noun phrase). It needs a thing, an object, to describe. That thing or object is the adjective's context. Not only does the adjective describe its context, but the context itself gives additional meaning to the adjective.

A disembodied adjective lacks full meaning. Let's try the adjective "rainy" as an example. One might ask, "Is it rainy enough to raise my umbrella?" Or one might ask, "Is it rainy enough to order that the city of New Orleans be evacuated?" These are vastly different contexts, despite sharing the adjective "rainy." "Rainy" in one of those contexts does not necessarily convey the same meaning as "rainy" in the other context.

So too has it been with "presumptively prejudicial." To be prejudicial enough to trigger a <u>Barker v. Wingo</u> balancing test is far from being prejudicial enough to declare that a defendant has been deprived of his constitutional right to a speedy trial. Such an automatic equivalency, however, is exactly what this appellant, and many appellants, seek. The adjective may literally be the same but its contexts are not. This is why even precisely the same word may not be placed in a different context. To raise one's umbrella is not to order the evacuation of New Orleans. It is clever lawyers who are the linguistic villains. They are the semantic shapeshifters. Shift the context and you shift the meaning of the common adjective. It is wise, therefore, to avoid the common adjective. *See* <u>Griffin v. State</u>, 262 Md. App. 103, 162, 317 A.3d 415 (2024) ("Beware the term: 'presumptively prejudicial.' It is slippery."). The generalized state of being "presumptively prejudicial" (of anything) is not an end in and of itself. It is essentially meaningless without some further predicate: "to be presumptively prejudicial enough TO DO WHAT?" In the words of the Bard, "That is the question."[7]

The quantum of evidence that will generate a prejudice in favor of raising one's umbrella is by no means the same as the far greater quantum of evidence necessary to generate a prejudice in favor of evacuating New Orleans. One prejudice does not equal every other prejudice. A prejudice in favor of conducting a <u>Barker v. Wingo</u> analysis is not a prejudice that one will prevail on the merits at such an analysis. Yet this is exactly what

---

[7] Shakespeare, William. *Hamlet*. Edited by G. R. Hibbard, Oxford UP, 2008.

the semantic shapeshifters seek to do when they try to shift the generation of a prejudice from one context into another.

That is, moreover, exactly what the appellant attempts to do here. He cites six cases that held that there was enough evidence to produce a presumptive prejudice in favor of conducting a <u>Barker v. Wingo</u> balancing test. He then attempts, however, to use those cases as presumptive prejudice that the appellant should prevail on the merits of that balancing test. Conducting a test and winning that test on the merits are two very different contexts. To qualify for the World Series and to win the World Series are not the same. A prejudice in favor of A is not a prejudice in favor of B. To raise your umbrella is not to evacuate New Orleans.

## The Absence Of Prejudice

The final <u>Barker v. Wingo</u> factor is that of any prejudice inflicted on this defendant caused by the trial delay. As <u>Barker</u> described the factor, 407 U.S. at 532:

> This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.

The first two of these interests have already been fully discussed in our lengthy analysis of the "length of delay" factor. The special interest that dominates our consideration of this prejudice factor is that of prejudice to the actual defense of the case. <u>Barker v. Wingo</u>, 407 U.S. at 532, elaborated:

63

[T]he most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

In this case, conclusively, there could have been no prejudice to the appellant's case for the defense because the appellant put on no case for the defense. The appellant did not testify. The appellant called no witnesses. Most notably, he did not call Cache Irvin, who arguably might have provided some semblance of an excuse for the appellant's actions, particularly his case based upon the defense of others. The narrative itself raised no suggestion that there could have been any meaningful witnesses. In short, there were no conceivable witnesses for the defense who had died or gone missing because of any delay in the trial of the case.

Of the handful of witnesses who did testify, there is not even a suggestion that any of them suffered any loss of memory because of a trial delay. There were no witnesses who were lost. There was no memory that was lost. There was no prejudice to a non-existent case. One cannot kill a ghost.

## The <u>Barker v. Wingo</u> Balancing

We have looked at all four of the <u>Barker v. Wingo</u> factors individually and in their relationship to each other. We do not hesitate to hold that the appellant did not suffer the loss of his constitutional right to a speedy trial. It was not even close.

## The Relative Lack Of Prejudice
## As A Counterweight To Reversible Error

64

At the very outset of this opinion, we characterized the appellant's three contentions as being "only marginal" in terms of their dispositive significance but as being "nonetheless very interesting." The "very interesting" common denominator feature is that the commission of trial error, by the prosecutor or by the trial judge or by both, does not necessarily mandate the reversal of a conviction. The indispensable ingredient for an appellate reversal is that of actual prejudice to the defendant. The very purpose of the trial is not to punish the commission of error on the part of the prosecutor or the trial judge but to insure the protection of the rights of the defendant. Absent some meaningful prejudice to those rights there is no problem to be resolved by what would be, under those circumstances, a meaningless reversal. Absent some harm that needs to be redressed, there is no need for any redress.

The appellant's first contention illustrated that basic truth. The appellant accused the trial judge of having failed, sua sponte, to intervene during the defense counsel's arguably erroneous advice to the appellant about the advantages and disadvantages of testifying in his own defense. We rejected that sub-contention because the appellant never established that the advisory advice by counsel was in any sense erroneous. For the appellant to have been prejudiced by erroneous advice, the advice must have been erroneous. The appellant, however, never established anything in that regard. He simply took prejudice for granted. He utterly failed to establish how he had been harmed in any respect. No redress, therefore, was necessary.

In a second contention, the appellant claimed that he had erroneously been denied his request to have had Maryland Pattern Jury Instruction: Criminal given to the jury with

65

respect to three separate defenses he wished to argue to the jury, to wit, self-defense, the defense of others, and mistake of fact. The appellant, of course, would have been entitled to such jury instructions on the three subjects if those subjects had been generated as legitimate jury issues by the evidence in the case. In each of the three instances, however, the appellant failed utterly to show that any of the three defenses had actually been generated as a legitimate issue in the case. Absent such preliminary entitlement to the jury instruction in the first place, there could be no prejudice in not receiving the benefit of a jury instruction to which one was not entitled. Once again, there was no showing of any prejudice. No harm, no redress.

In his third contention, the appellant claimed that he had been denied his right to a speedy trial. When the factor of the closing of the courts due to the Covid-19 pandemic was factored out, the length of delay remaining for analysis was not in itself at all excessive. The demand-waiver factor amounted to essentially nothing. Prejudice to the appellant's case amounted to nothing for the obvious reason that there was no appellant's case. This contention died because of the lack of any significant prejudice.

The common denominator there running through all three of the contentions currently before us is that a potential procedural error, which may or may not be of any significance in a given case, does not in and of itself amount to reversible error. What is also required is that the possible error shall have resulted in some discernable dire consequence for the defendant, to wit, some actual prejudice. To qualify as reversible error, the possible procedural error, as an abstract principle, will not do the trick. Actual and

66

discernable prejudice to the defendant under the particular circumstances of a given case is the essential ingredient.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

Judge Zic joins in the judgment only.